# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

MARCUS TENNYSON,                    Case No. 1:10-cv-160
    Plaintiff                    Spiegel, J.
                                    Litkovitz, M.J.

    vs

COMMISSIONER OF                     **REPORT AND**
SOCIAL SECURITY,                    **RECOMMENDATION**
    Defendant


Plaintiff brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final

decision of the Commissioner of Social Security (Commissioner) denying plaintiff's applications

for Supplemental Security Income (SSI) and Child's Insurance Benefits (CIB) based on

disability. This matter is before the Court on plaintiff's Statement of Errors (Doc. 8), the

Commissioner's response in opposition (Doc. 14), and plaintiff's reply. (Doc. 16).

## PROCEDURAL BACKGROUND

Plaintiff was born in 1989 and turned 18 in September 2007. He has a high school

education. He worked temporary, part-time jobs and has no past relevant work. (Tr. 24, 160).

Plaintiff filed application for SSI and CIB claiming disability as of March 1, 2006. Plaintiff

alleges he is disabled due to mental problems, including auditory hallucinations, behavior

problems, and paranoia. (Tr. 121). The applications were denied initially and upon

reconsideration. Plaintiff then requested and was granted a de novo hearing before

administrative law judge (ALJ) Larry A. Temin. (Tr. 31-70). Plaintiff, who was represented by

counsel, appeared at the hearing with his mother, Willie Mae Bell. Both plaintiff and his mother

testified at the hearing.  (Tr. 35-62).  An independent vocational expert (VE) also appeared and testified at the hearing.  (Tr. 63-68).

On December 29, 2008, after plaintiff had turned 18, the ALJ issued a decision denying plaintiff's CIB and SSI applications.  (Tr. 8-26).  The ALJ determined that both before and after attaining age 18, plaintiff had the following "severe combination of impairments":  paranoid schizophrenia, affective disorder, and ADHD (Attention Deficit Hyperactivity Disorder).  (Tr. 13).  However, under both the regulations applicable to an individual under the age of 18 and the regulations applicable to an individual age 18 or older who has a disability that began before attaining age 22, the ALJ concluded that plaintiff has not been disabled within the meaning of the Social Security Act since March 15, 2006, the date he filed his SSI application.  (Tr. 9).

The Appeals Council denied plaintiff's request for review, making the decision of the ALJ the final administrative decision of the Commissioner.  (Tr. 1-4).

## APPLICABLE LAW

The following principles of law control resolution of the issues raised in this case. Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). The Court's sole function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision.  The Commissioner's findings stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).  In deciding whether the Commissioner's findings are supported by substantial evidence, the Court must consider the record as a whole.  *Hephner v. Mathews*, 574 F.2d 359, 362 (6th Cir. 1978).

To qualify for SSI, plaintiff must file an application and be an "eligible individual" as defined in the Act. 42 U.S.C. § 1382(a); 20 C.F.R. § 416.202. Eligibility is dependent upon disability, income, and other financial resources. *Id.*; 20 C.F.R. § 416.202. An individual under the age of 18 shall be considered disabled for purposes of SSI "if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i). To qualify for SSI for the period starting with the day the individual attains the age of 18, the individual must be disabled and fall within certain income and resource eligibility limits. 42 U.S.C. § 1382(a); 20 C.F.R. § 416.202. An individual over the age of 18 who is disabled is entitled to child's insurance benefits if his disability began before he attained the age of 22 and he meets certain eligibility requirements. 20 C.F.R. § 404.350.

In evaluating a claim for SSI, the rules set forth in 20 C.F.R. § 416.924 apply to the period during which an individual was under age 18. Section 416.924(a)-(d) sets forth a three-step sequential analysis for determining whether a child is disabled. The first step is to determine whether the child is engaged in any substantial gainful activity. The second step is to decide whether the child has a medically severe impairment or combination of impairments. An impairment that is only a slight abnormality or combination of slight abnormalities and which causes no more than minimal limitations is not a severe impairment. 20 C.F.R. § 416.924(c). The third step is to determine whether the child's impairment meets, medically equals, or functionally equals any in the Listing of Impairments, Appendix 1 of 20 C.F.R. pt. 404, subpt. P. 20 C.F.R. § 416.924(a). An impairment which meets or medically equals the severity of a set of

3

criteria for an impairment in the Listing, or which functionally equals the Listing, causes marked and severe functional limitations. 20 C.F.R. § 416.924(d). If the child's impairment meets, medically equals, or functionally equals the Listing, and if the impairment satisfies the Act's duration requirement, then the child is considered disabled. 20 C.F.R. § 416.924(d)(1). If both of these requirements are not satisfied, then the child is not considered disabled. 20 C.F.R. 416.924(d)(2).

The Listing is divided into two parts according to age. Part A contains criteria that apply to individuals age 18 and over, but it may also be used for individuals who are under age 18 if the disease processes have a similar effect on adults and children and the criteria in Part B do not apply. 20 CFR § 416.925. Part B contains criteria that apply only to individuals who are under age 18, and it is used first in evaluating disability for an individual under age 18. *Id.* For each of the major body system impairments, Part B describes impairments considered severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience. *Id.* Part A describes impairments for children that cause "marked and severe functional limitations." *Id.* Generally, a child's impairment is of "listing-level severity" if it causes marked limitations in two domains of functioning or an extreme limitation in one as described in 20 C.F.R. § 416.926a(a). 20 C.F.R. § 416.925(b)(2)(ii).

Similarly, to functionally equal an impairment in the Listing, an impairment must result in "marked" limitations in two domains of functioning by which functional limitations are evaluated or an "extreme" limitation in one domain. 20 C.F.R. § 416.926a. The six domains by which functional limitations are evaluated are: i) acquiring and using information; ii) attending and completing tasks; iii) interacting and relating with others; iv) moving about and manipulating

objects; v) caring for oneself; and vi) health and physical well-being. 20 C.F.R. §

416.926a(b)(1)(i)-(vi). Relevant factors that will be considered in making this evaluation are (1)

how well the child initiates and sustains activities, how much extra help he needs, and the effects

of structured or supportive settings; (2) how the child functions in school; and (3) how the child

is affected by his medications or other treatment. 20 C.F.R. § 416.926a(a)(1)-(3).

An individual has a "marked" limitation when the impairment "interferes seriously with

[the] ability to independently initiate, sustain, or complete activities." 20 C.F.R. §

416.926a(e)(2)(i). A "marked" limitation is one that is "more than moderate" but "less than

extreme." *Id*. An "extreme" limitation exists when the impairment "interferes very seriously

with [the] ability to independently initiate, sustain, or complete activities." 20 C.F.R. §

416.926a(e)(3)(i). An extreme limitation may also seriously limit day-to-day functioning. *Id*.

The five-stop sequential evaluation process set forth in 20 C.F.R. § 416.920 applies to a

claim for SSI by an individual who has attained age 18. *Id*. First, the Commissioner determines

whether the individual is currently engaging in substantial gainful activity; if so, a finding of

nondisability is made and the inquiry ends. Second, if the individual is not currently engaged in

substantial gainful activity, the Commissioner must determine whether the individual has a

severe impairment or combination of impairments; if not, then a finding of nondisability is made

and the inquiry ends. Third, if the individual has a severe impairment, the Commissioner must

compare it to those in the Listing. The individual's impairment need not precisely meet the

criteria of the Listing in order for him to obtain benefits. It is sufficient if the impairment is

medically equivalent to one in the Listing. 20 C.F.R. § 416.920(d). If the impairment meets or

equals any within the Listing, disability is presumed and benefits are awarded. *Id*. Fourth, if the

individual's impairment does not meet or equal any in the Listing, the Commissioner must determine whether the impairment prevents the performance of the individual's regular previous employment. If the individual is unable to perform the relevant past work, then a prima facie case of disability is established and the burden of going forward with the evidence shifts to the Commissioner to show that there is work in the national economy which the individual can perform. *Lashley v. Secretary of H.H.S.*, 708 F.2d 1048, 1053 (6th Cir. 1983); *Kirk v. Secretary of H.H.S.*, 667 F.2d 524, 529 (6th Cir. 1981).

A mental impairment may constitute a disability within the meaning of the Act. *See* 42 U.S.C. §§ 423(d)(1)(A); 1382c(a)(3)(A). The sequential evaluation analyses outlined in 20 C.F.R. §§ 416.920 and 416.924 apply to the evaluation of mental impairments. 20 C.F.R. § 416.920a. However, the regulations provide a special procedure for evaluating the severity of a mental impairment at steps two and three for individuals age 18 and over. *Id*. The special procedure also applies when Part A of the Listing is used for an individual under age 18. *Id*. At step two, the ALJ must evaluate the claimant's "symptoms, signs, and laboratory findings" to determine whether the individual has a "medically determinable mental impairment(s)." *Rabbers v. Commissioner Social Sec. Admin.*, 582 F.3d 647, 653 (6th Cir. 2009) (analyzing 20 C.F.R. § 404.1520a(b)(1), parallel DIB provision to § 416.920a). If so, the ALJ "must then rate the degree of functional limitation resulting from the impairment." *Id*. (citing 20 C.F.R. § 404.1520a(b)(2)).

The claimant's level of functional limitation is rated in four functional areas, commonly known as the "B criteria": 1) activities of daily living; 2) social functioning; 3) concentration, persistence, or pace; and 4) episodes of decompensation. *Id.* (citing 20 C.F.R. § 404.1520a(c)(3); 20 C.F.R. pt. 404, Subpt. P, App. 1, § 12.00 et seq.; *Craft v. Astrue,* 539 F.3d 668, 674 (7th Cir.

2008)).  The degree of limitation in the first three functional areas is rated using the following five-point scale:  None, mild, moderate, marked, and extreme.  *Id.* (citing 20 C.F.R. § 404.1520a(c)(4)).  The degree of limitation in the fourth functional area (episodes of decompensation) is rated using a four-point scale:  None, one or two, three, four or more.  *Id.*  "If the ALJ rates the first three functional areas as 'none' or 'mild' and the fourth area as 'none,' the impairment is generally not considered severe and the claimant is conclusively not disabled."  *Id.* (citing 20 C.F.R. § 404.1520a(d)(1)).  Otherwise, the impairment is considered severe and the ALJ will proceed to step three.  *Id.* (citing 20 C.F.R. § 404.1520a(d)(2)).

At step three of the sequential evaluation, the ALJ must determine whether the claimant's impairment "meets or is equivalent in severity to a listed mental disorder."  *Id.* (citing 20 C.F.R. § 404.1520a(d)(2)).  If the claimant's impairment meets the requirements of the Listing, he will be deemed conclusively disabled.  *Id.*  If the ALJ determines that the claimant has a severe mental impairment that neither meets nor medically equals a listed impairment, the ALJ will then assess the claimant's RFC before completing steps four and five of the sequential evaluation process.  *Id.* (citing 20 C.F.R. § 404.1520a(d)(3)).

Plaintiff has the burden of proof at the first five steps of the sequential evaluation process.  *Wilson v. Commissioner of Social Security*, 378 F.3d 541, 548 (6th Cir. 2004).  Once plaintiff establishes a prima facie case by showing an inability to perform the relevant previous employment, the burden shifts to the Commissioner to show that plaintiff can perform other substantial gainful employment and that such employment exists in the national economy.  *Harmon v. Apfel*, 168 F.3d 289, 291 (6th Cir. 1999); *Born v. Secretary of Health and Human Servs.*, 923 F.2d 1168, 1173 (6th Cir. 1990).  To rebut a prima facie case, the Commissioner

7

must come forward with particularized proof of plaintiff's individual capacity to perform alternate work considering plaintiff's age, education, and background, as well as the job requirements. *Wilson*, 378 F.3d at 548. *See also Richardson v. Secretary of Health & Human Services*, 735 F.2d962, 964 (6th Cir. 1984). Alternatively, in certain instances the Commissioner is entitled to rely on the medical-vocational guidelines (the "grid") to rebut plaintiff's prima facie case of disability. 20 C.F.R. Subpart P, Appendix 2; *Wilson*, 378 F.3d at 548.

It is well-established that the findings and opinions of treating physicians are entitled to substantial weight. "In general, the opinions of treating physicians are accorded greater weight than those of physicians who examine claimants only once." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529-530 (6th Cir. 1997). *See also Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985) ("The medical opinions and diagnoses of treating physicians are generally accorded substantial deference, and if the opinions are uncontradicted, complete deference."). Likewise, a treating physician's opinion is entitled to substantially greater weight than the contrary opinion of a non-examining medical advisor. *See Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987). If a treating physician's "opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record," the opinion is entitled to controlling weight. 20 C.F.R. § 404.1527(d)(2); *see also Blakley v. Commissioner*, 581 F.3d 399, 406 (6th Cir. 2009); *Wilson v. Commissioner*, 378 F.3d 541, 544 (6th Cir. 2004). "The treating physician doctrine is based on the assumption that a medical professional who has dealt with a claimant and his maladies over a long period of time will have a deeper insight into the medical condition of the claimant than will a person who has examined

8

a claimant but once, or who has only seen the claimant's medical records." *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994). The Social Security regulations likewise recognize the importance of longevity of treatment, providing that treating physicians "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. § 404.1527(d)(2).

If the ALJ does not give the treating source's opinion controlling weight, then the ALJ must consider a number of factors when deciding what weight to give the treating source's opinion. 20 C.F.R. § 404.1527(d). These factors include the length, nature and extent of the treatment relationship and the frequency of examination. 20 C.F.R. § 404.1527(d)(2)(i)(ii); *Wilson*, 378 F.3d at 544. In addition, the ALJ must consider the medical specialty of the source, how well-supported by evidence the opinion is, how consistent the opinion is with the record as a whole, and other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(d)(3)-(6); *Wilson*, 378 F.3d at 544. The ALJ must likewise apply the factors set forth in § 404.1527(d)(3)-(6) when considering the weight to give a medical opinion rendered by a non-treating source. 20 C.F.R. § 404.1527(d). When considering the medical specialty of a source, the ALJ must generally give "more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist." 20 C.F.R. § 404.1527(d)(5).

The opinion of a non-treating but examining source is entitled to less weight than the opinion of a treating source, but is generally entitled to more weight than the opinion of a source

who has not examined the claimant. *Ealy v. Commissioner of Soc. Sec.*, 594 F.3d 504, 514 (6th Cir. 2010) (citing 20 C.F.R. § 404.1527(d)(1); *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007)). The weight to be afforded the opinion of a non-examining source depends on the degree to which the source provides supporting explanations for his opinions and the degree to which his opinion considers all of the pertinent evidence in the record, including the opinions of treating and other examining sources. 20 C.F.R. § 404.1527(d)(3).

In light of the Commissioner's opportunity to observe the individual's demeanor, the Commissioner's credibility finding is entitled to deference and should not be discarded lightly. *Buxton v. Halter,* 246 F.3d 762, 773 (6th Cir. 2001); *Kirk*, 667 F.2d at 538. "If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reasons for doing so." *Felisky v. Bowen,* 35 F.3d 1027, 1036 (6th Cir. 1994). The ALJ's articulation of reasons for crediting or rejecting a claimant's testimony must be explicit and "is absolutely essential for meaningful appellate review." *Hurst v. Sec. of H.H.S.*, 753 F.2d 517, 519 (6th Cir. 1985) (citing *Zblewski v. Schweiker*, 732 F.2d 75, 78 (7th Cir. 1984)).

## MEDICAL RECORD

On March 21, 2003, when plaintiff was 13 years old, a physician at Winton Hills Medical & Health Center noted that plaintiff had ADHD which was responding well to medication. (Tr. 170). The physician recommended that plaintiff take tests in small class settings to minimize distractions. *Id.*

Plaintiff was seen for an individual diagnostic assessment by a therapist/licensed social worker (L.S.W.) on May 8, 2003, at the Center for Children and Families. (Tr. 239-45). Plaintiff appeared to be having problems with mood, paranoia, and anxiety. (Tr. 241). Plaintiff's mother

reported that he had very low self-esteem, he had few friends, he was easily intimidated by others, and he felt lonely and depressed. Plaintiff reportedly did not like being away from his mother and followed her around frequently. Plaintiff's mother also reported that he appeared overly concerned about whether others liked him or were talking about him. Plaintiff was doing poorly academically because he was easily distracted around others. Plaintiff's pediatrician had prescribed Ritalin for him. Plaintiff's mother further reported that plaintiff had done well up until the 2nd or 3rd grade, but the teachers needed to make special allowances for him. Plaintiff had met with the school psychologist two weeks prior to this assessment. Plaintiff reported that he had problems with depression and felt tired most of the time. He reported problems falling asleep and waking up frequently in the middle of the night. The therapist noted that during the interview, plaintiff had trouble sitting still and constantly moved and fidgeted. The therapist's diagnostic impressions were mood disorder and social problems with peers. The therapist assigned plaintiff a Global Assessment of Functioning (GAF) score of 56.[1] The therapist recommended individual therapy and further assessment by a psychiatrist to rule out bipolar disorder. (Tr. 241). On May 29 2003, plaintiff was referred for individual therapy and psychiatric services. (Tr. 239).

---

[1] A GAF score represents "the clinician's judgment of the individual's overall level of functioning." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, p. 32 (4th ed., text rev. 2000). The GAF score is taken from the GAF scale, which "is to be rated with respect only to psychological, social, and occupational functioning." *Id.* The GAF scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). *Id.* at 34. The DSM-IV categorizes individuals with scores of 41 to 50 as having "serious" symptoms. *Id.* Individuals with scores of 51-60 are classified as having "moderate" symptoms. *Id.* The next higher category, for scores of 61 to 70, refers to an individual with "some mild" symptoms who is "generally functioning pretty well." *Id.* A score of 71-80 indicates that "[i]f symptoms are present, they are transient and expectable reactions to psycho-social stressors" and represent "no more than slight impairment in social, occupational, or school functioning." *Id.*

11

On August 26, 2003, Marlene Schmidt, M.D., a psychiatrist, performed a psychiatric evaluation. (Tr. 235-37). Plaintiff had been referred for what Dr. Schmidt described as "long standing and now worsening issues, as far as mood, sadness, low self-esteem, and ongoing fatigue, as well as symptoms of inattention, disorganization, and impulsivity." (Tr. 235). He presented with problems sleeping at night, poor concentration, hopelessness, feelings of guilt, sadness, anger, and depression, usually precipitated by his brothers or his peers, crying spells, irritability, moodiness, and lack of academic success. (Tr. 236). On mental status examination, plaintiff avoided eye contact and tended to turn away. He was somewhat guarded but relaxed and showed full range of affect. (Tr. 237). He had occasional suicidal ideation "but no plan and no specific homicidal ideation plan." (Tr. 237). His mood was sad, irritable, and angry. His speech was generally goal directed and articulate, his memory was intact, his concentration was adequate, his judgment and insight were fair, and his IQ was estimated as average. There was no clear paranoia, nor hallucinations or evidence of a formal thought disorder. Dr. Schmidt concluded, "This is a young man who comes to us with long-standing problems that have not had any significant relief and who has stress within his household and a positive family history, as well as lack of academic success and sensitivity to this. He has probably been dysthymic for some time but now would fit criteria for even a major depressive episode." (Tr. 237). Dr. Schmidt diagnosed plaintiff with major depressive disorder, dysthymia, and ADHD. Dr. Schmidt assigned plaintiff a GAF score of 60-65. Dr. Schmidt recommended continued therapy and assistance for his family in getting plaintiff resources for school, and she prescribed medication. (Tr. 237).

12

On September 16, 2003, Dr. Schmidt noted that plaintiff's eye contact was poor and he related that his mood was "kind of numb." (Tr. 233). He was not having crying spells, was not overly anxious, and was not having behavioral problems at that time. (Tr. 233). Dr. Schmidt noted that plaintiff may have responded somewhat to medication, but she recommended that he receive the full dosage, she prescribed a trial a Adderall in addition to Wellbutrin, and she stressed the need for regular therapy. She also referred plaintiff to case management for assistance with school and supervision at home. (Tr. 234).

On January 28, 2005, Ruth Schrider, L.S.W., evaluated plaintiff. (Tr. 223-30). On mental status examination, he was cooperative, hyperactive and coherent. (Tr. 229). His affect was depressed and his mood was dysphoric. (Tr. 229). Ms. Schrider reported that plaintiff had been stabilized several months earlier on medications for ADHD and depression. (Tr. 230). However, he had since been diagnosed with glaucoma (*See* Tr. 171-82, 298-306), and his physician had recommended discontinuing the ADHD medication due to cross-reactions with the glaucoma medication. His behavior at school had deteriorated, and plaintiff's mother hoped he could take another ADHD medication. Plaintiff reported that he "got the same old feelings back" that he had before talking with the therapist. (Tr. 230). Ms. Schrider recommended outpatient therapy and psychiatric evaluation/treatment.

In February 2005, an Individual Service Plan (ISP) was created to re-establish plaintiff's treatment for ADHD and reduce his symptoms of depression. (Tr. 220-22). Ms. Schrider assessed plaintiff's prognosis as good. (Tr. 222). That same month, Dr. Schmidt performed a psychiatric re-evaluation, noting that plaintiff's case had been closed because there had been significant improvements but that he was being re-seen in light of a recurrence of attention deficit

13

symptoms. (Tr. 216-19). Dr. Schmidt observed that, unlike his first presentation, plaintiff was easier to engage, his speech was coherent and goal directed without evidence of a formal thought disorder, and his concentration was generally adequate. (Tr. 216, 218). He denied any history of hallucinations, paranoia, or other problems in the nature of a thought disorder. (Tr. 218). Dr. Schmidt diagnosed dysthymia and ADHD and assigned a GAF score of 65-70, noting that compared to the original symptoms, plaintiff was "still managing fairly well." (Tr. 218). Dr. Schmidt prescribed medication and readjusted his current medications, noting that stimulant medications were contraindicated by his glaucoma. (Tr. 218-219).

Dr. Schmidt subsequently reported in October 2005 that she had confirmed that plaintiff's glaucoma would not be aggravated by stimulant medications. (Tr. 212). Plaintiff had been off medication based on that concern, and he had been moody, was unhappy but not suicidal, and was not sleeping well. He was having continuing symptoms of ADHD, which had responded well to Adderall in the past. He was failing most of his classes, having difficulties with reactions to teachers at times, and was probably somewhat impulsive as well as irritable. Dr. Schmidt prescribed new medication for plaintiff to try. Plaintiff was to continue to follow up with Ms. Schrider. (Tr. 212-13, 215).

On November 17, 2005, Dr. Schmidt reported that plaintiff's mood was worse. (Tr. 211). He was depressed and anhedonic, but he was not suicidal or psychotic. (Tr. 211). He was easily agitated and could act out in an aggressive manner if provoked. Plaintiff had not started on Focalin because of medical insurance issues. Dr. Schmidt prescribed medication and strongly recommended regular therapy sessions. (Tr. 211).

On January 4, 2006, Dr. Schmidt saw plaintiff and his mother. (Tr. 209-210). They acknowledged that the medication had helped his mood to some degree and that he was not as irritable, although there was still some depression and irritability. (Tr. 209). Plaintiff was alert, oriented, and pleasant, and he had fairly good eye contact. (Tr. 209). Dr. Schmidt recommended continuing therapy, and she continued and adjusted plaintiff's medications. (Tr. 210).

On May 11, 2006, Dr. Schmidt reported that plaintiff was doing better on his medication. (Tr. 204). Plaintiff reported that he sometimes feels people are plotting things against him and that he does not like it if people look at him a lot. He also reported getting agitated if people were too close to him, but it was unclear whether it was paranoia. Dr. Schmidt reported that plaintiff was more spontaneous than in the past; he did not appear to be reacting to external stimuli while with her; and he was not suicidal or homicidal, but he could be labile or reactive elsewhere. (Tr. 204). According to reports, he could be defensive and angry. (Tr. 205). Dr. Schmidt expressed uncertainty as to whether plaintiff's discomfort was more from anxiety about being in situations or whether he is paranoid. Dr. Schmidt continued and adjusted his medications. (Tr. 205).

On July 19, 2006, Dr. Schmidt reported that "There are some continued problems with irritability, but really, also significant, angry thoughts that he has brought up to some point . . . . He notes that the anger really comes up when he feels others are trying to intimidate him . . . ." (Tr. 202). He did not appear psychotic. He was not suicidal or homicidal, although his reported mood was about a 5 out of 10 most of the time. Dr. Schmidt managed his medications and prescribed Risperdal to help with thoughts plaintiff had of possibly doing something harmful to

15

others, which plaintiff reported were sometimes so strong that he questioned whether he could resist them. (Tr. 202).

> On August 23, 2006, Dr. Schmidt noted as follows:

> When Marcus was last seen in July, he described that he does have some significant paranoia and discomfort in being around groups, as he is suspicious of others. We have tried him on some Risperdal . . . . He is feeling somewhat better. There is still suspiciousness, so we discussed [] arrangements to get to school; there is reluctance as far as going and even getting on the bus. Although it sounds like he feels he could manage people messing with him better, there is still some component of the paranoia that may be adding to that reluctance . . . . As you explore it further, it does appear that there is some reluctance to be around groups of people and trust others. Sometimes, this is for fairly accurate reasons . . . .

(Tr. 199). Dr. Schmidt recommended that the Risperdal dosage be increased and that he be continued on Zoloft and Focalin. (Tr. 200). They discussed a plan for plaintiff to take drivers' education. (Tr. 200).

On September 14, 2006, Dr. Schmidt reported that she had recently learned that besides plaintiff's depression, "he has had some significant paranoia for which he would like some relief." (Tr. 197). While Dr. Schmidt noted that plaintiff had felt a "significant benefit" from Risperdal and had experienced benefit in the past from Focalin and Zoloft, there were now concerns with side effects. (Tr. 198). His depression was improved but he was "more anxious with the paranoia." (Tr. 198). Dr. Schmidt adjusted plaintiff's medications. (Tr. 198).

On July 21, 2006, plaintiff was examined by consulting psychologist, George Lester, Psy.D., on behalf of the Ohio Bureau of Disability Determination. (Tr. 183-87). Dr. Lester reported that plaintiff did not smile and had a constricted range of affect. (Tr. 185). Plaintiff

16

came across as controlled and cautious. Plaintiff responded to questions in a careful and thoughtful manner. He was able to converse without difficulty. No obvious anxiety signs were noted. Plaintiff reported that he felt that people talk about him and say bad things about him, he feels upset and anxious when around "mass people," and his heart starts beating more. (Tr. 186). He stated that he handles it by getting "mad and cussin'." (Tr. 186). Plaintiff told Dr. Lester that he knows people are talking about him. Dr. Lester diagnosed Mood Disorder, not otherwise specified (NOS), Anxiety Disorder (NOS), and ADHD (NOS) and identified as psychosocial stressors, "No major change." (Tr. 186). Dr. Lester assigned a GAF score of 50-55. (Tr. 186). He estimated that plaintiff was functioning at the following levels:

- Cognitively: 3/4 or more of his age appropriate level.
- Motor skills: 3/4 of his age appropriate level for both fine and gross motor skills.
- Communication skills: 3/4 of his age appropriate level for both speech and language.
- Personal/behavior patterns: 2/3 of his age appropriate level as he spends most of his time in his room and watching television and playing video games; he does not do his chores in a timely manner; and he has many problems at school with temper control and appropriate expression of anger.
- Socially: 2/3 of his age appropriate level as he angers easily and appears to be quite dependent upon his mother; he avoids situations where he will be around a "mass" of people; he feels that people are talking about him; and he experiences delusional thinking and possible auditory hallucinations.
- Concentration, persistence and pace: 2/3 of the age appropriate level.

(Tr. 187).

In August 2006, a state agency reviewing physician, Silvia Vasquez, M.D., and a state agency reviewing psychologist, Caroline Lewin, Ph.D., completed a childhood disability evaluation form. (Tr. 188-93). They determined that plaintiff suffered from ADHD, mood disorder, anxiety disorder, and glaucoma, but that while severe, his impairments did not meet,

medically equal, or functionally equal the Listings. (Tr. 188). They gave the following domain

evaluations and comments of significance:

- Acquiring and using information: No limitation.
- Attending and completing tasks: Less than marked limitation. He has a history of ADHD and takes medication. He does not complete his chores in a timely fashion.
- Interacting and relating with others: Marked limitation. "He has problems getting along with others. He avoids situations where he will [be] around a 'mass' of people. He feels that people are talking about him. He has violent rhetoric but does not act it out." (Tr. 190).
- Moving about and manipulating objects: No limitation.
- Caring for yourself: No limitation.
- Health and physical well-being: Less than marked limitation.

(Tr. 190-91).

In January 2007, a reviewing physician, John Mormol, M.D., and a reviewing consultant,

Cindy Matyi, Ph.D., completed a childhood disability evaluation form in which they found the

same impairments as the previous state agency reviewers. (Tr. 248-53). They likewise

determined that plaintiff's impairments did not meet, medically equal or functionally equal the

Listings. (Tr. 248). They rendered the following domain evaluations with explanatory

comments:

- Acquiring and using information: No limitation. "Cognitive functioning is in the average range."
- Attending and completing tasks: Less than marked limitation. Although the claimant's mother reported that he cannot concentrate, and he has a history of ADHD, "current psych note states that the meds are helping with his condition." (Tr. 250).
- Interacting and relating with others: Marked limitation. "Clmt fights with his siblings and does not get along with his teachers. Delusional thinking." (Tr. 250).
- Moving about and manipulating objects: No limitation.
- Caring for yourself: Less than marked limitation. "Not as independent as he should be at age 17."
- Health and physical well-being: Less than marked limitation. Claimant has open-angle glaucoma which is controlled with medications.

(Tr. 250-51).

Plaintiff continued therapy with Helene Berger, M.Ed., and Gerald Bailey, M.S.W., L.S.W., from November 2006 to July 2008. (Tr. 361-63, 371-87). Plaintiff also treated with Timothy Jette, M.D., a psychiatrist, at the Center for Children and Families, from March 2007 to October 2008. (Tr. 339-360). Dr. Jette's diagnoses of plaintiff included paranoid schizophrenia, major depression, and ADHD. (Tr. 339-60). Dr. Jette reported that plaintiff had paranoia; episodes of "going off" with shouting and cursing, punching walls, and hurting or wanting to hurt people; auditory hallucinations; and/or discomfort around others. (Tr. 343, 346, 347, 349, 354, 356-357, 359). In June 2008, plaintiff's medications were Abilify, Zoloft, and Adderal. (Tr. 339). Dr. Jette noted that plaintiff was sad most of the time and his energy and concentration were down. Plaintiff had chronic suicidal ideation, but no suicide plan. (Tr. 340). Dr. Jette discussed a suicide safety plan and increasing plaintiff's medications for better paranoia and depression control. (Tr. 340).

In October 2008, when plaintiff was age 19, Dr. Jette completed a mental impairment questionnaire. (Tr. 389-91). Dr. Jette reported that he had treated plaintiff monthly for 18 months. (Tr. 389). His diagnoses included paranoid schizophrenia and ADHD, and he indicated that plaintiff had moderate psychosocial stressors. Dr. Jette reported that plaintiff was on several medications but that his depression and negative symptoms persisted. (Tr. 389). Dr. Jette assigned plaintiff a current GAF score of 45 and stated that plaintiff's highest GAF score in the past year was 50. Dr. Jette described the clinical findings that demonstrated the severity of plaintiff's symptoms as follows:

> Marcus remains consistently paranoid. His mood is labile. He is sad with a bad temper. He sometimes threatens to [illegible] people. He has suicide thoughts. He has some command hallucinations.

19

(Tr. 389). Dr. Jette noted that plaintiff missed many therapy and psychiatry appointments. (Tr.

(Tr. 389). Dr. Jette opined that plaintiff had the following functional limitations:

- Moderate restriction of activities of daily living;
- Marked difficulties in maintaining social functioning;
- Moderate difficulties in maintaining concentration, persistence, or pace; and
- One or two episodes of decompensation within a twelve month period, each of at least two weeks duration.

(Tr. 390). Dr. Jette also stated that plaintiff had the following:

> A medically documented history of a chronic organic mental, schizophrenic, etc.,
> or affective disorder of at least two years' duration that has caused more than a
> minimal limitation of ability to do any basic work activity, with symptoms or
> signs currently attenuated by medication or psychological support; and . . .
> A residual disease process that has resulted in such marginal adjustment that even
> a minimal increase in mental demands or change in the environment would be
> predicted to cause the individual to decompensate.

(Tr. 390). Dr. Jette opined that plaintiff was limited to the following extent:

- Cognitive development:  Moderate
- Communicative development:  Less than moderate
- Social development:  Marked
- Personal/behavioral development:  Marked.
- Concentration, persistence or pace:  Moderate development.

(Tr. 391).

## EDUCATIONAL RECORDS

In 2004, when he was 14 years old, plaintiff was assessed under the Individuals with

Disabilities Education Act for special education purposes. (Tr. 274-96). The evaluation team,

which consisted of teachers, the principal, a counselor and a school psychologist, reported that

plaintiff's ADHD and depression adversely affected his educational performance. (Tr. 280).

Plaintiff was tested as part of the individualized education plan (IEP)[2] development process. (Tr. 274-278). The evaluators and school psychologist determined based on the test results that plaintiff was functioning in the average range of intelligence. Despite having completed the 8th grade once already, plaintiff was reading at a 5th to 6th grade level (Tr. 274); his math calculation skills were at an early 7th-grade level, although he scored at a late 3rd-grade level for a timed math test, and his math reasoning skills were at an early 10th-grade level (Tr. 274-275); and his writing skills were at the middle 5th to late 10th-grade level. (Tr. 277-78). Plaintiff's academic proficiency scores were estimated to be at the early 7th and middle 8th-grade levels. (Tr. 278). Plaintiff scored at the level of a child age 12 years 3 months in fine motor development. (Tr. 278). Self-ratings of social-emotional skills indicated clinically significant findings for depression and at-risk scores for social stress, anxiety, and overall emotional state. (Tr. 278-79). Social, emotional and behavioral development testing revealed that plaintiff scored in the "at-risk" category for the emotional symptoms index and the school maladjustment index. (Tr. 278-79). The team recommended the following accommodations: extending the time for completing tests and school tasks; allowing plaintiff to take standardized tests in an area with fewer distractions than the typical classroom; and extending the time for plaintiff to turn in assignments. (Tr. 287).

---

[2]Under the Individuals with Disabilities Education Act, 20 U.S.C. § 1401, *et seq.*, children who are identified as having a disability are entitled to special education and related services to address their "unique needs and prepare them for further education, employment, and independent living." *See* 20 U.S.C. § 1400(d)(1)(A). School districts must establish an IEP for each child with a disability. *See Deal v. Hamilton County Bd. of Educ.*, 392 F.3d 840, 853 (6th Cir. 2004). The IEP must "contain a specific statement of the child's current performance levels, the child's short-term and long-term goals, the educational and other services to be provided, and criteria for evaluating the child's progress." *Deal*, 392 F.3d at 853 (quoting *Knable v. Bexley City Sch. Dist.,* 238 F.3d 755, 763 (6th Cir. 2001)).

21

In preparing plaintiff's IEP for the 2006-2007 school year, the evaluators reported that plaintiff had been removed from the general classrooms and placed in resource rooms for English and math because his absences and lack of preparedness had caused him to suffer great frustration and poor grades. (Tr. 255). Following the change, it was noted that his attendance, attitude and academic performance had greatly improved, but inconsistencies in his behavior and performance were noted. Plaintiff's evaluators observed: "Marcus is a student who varies greatly from day to day. One day, he is on task, participating in class with insightful answers. On other days, Marcus may be talkative and disruptive. On still other days, Marcus may be in a bad mood and be argumentative and angry." (Tr. 255). The evaluators identified the services necessary for plaintiff to attain his goals and progress in the curriculum with the accommodations of the resource room with a small group setting as needed, having tests read to him, "extended time," and a reduced workload. (Tr. 257-258).

As of April 2007, plaintiff was making adequate progress towards most of the IEP objectives. (Tr. 332-33). As of May 2007, the evaluators noted that plaintiff was "an excellent student who always works hard," he was quiet, he kept to himself, and he had no behavior issues. (Tr. 317). They also noted that plaintiff was "completing his programs much faster than expected." (Tr. 317). As of January 2008, plaintiff had completed all required course work toward graduation and was to work on work-study goals the remainder of the year. (Tr. 308-09, 317).

In March 2008, the evaluators reported that plaintiff was making adequate progress towards most of the IEP objectives, including identifying specific triggers so that he could control his emotions when frustrated by others; developing strategies to address these triggers in

22

a positive way; completing a task without being distracted 80% of the time; returning to a task if he was distracted with a maximum of two prompts daily; and beginning to work promptly when instructed to do so by his teacher 90% of the time. (Tr. 334-35).

## PLAINTIFF'S TESTIMONY AT THE HEARING

Plaintiff testified at the administrative hearing that he did not think he could work because he had problems with customers when "working in the open" and with coworkers otherwise. (Tr. 41). He testified that he had several jobs which had ended in either termination or his quitting due to problems getting along with co-workers and customers. (Tr. 37-41). Plaintiff testified that he took medication for paranoid schizophrenia and depression, he did not experience side effects, and the medication helped. (Tr. 42-43, 47-48). His symptoms included nervousness around people, sleeplessness, hearing voices, paranoid thoughts, trouble concentrating and memory problems. (Tr. 43-45). He had thoughts of suicide and had tried to hurt himself about five months prior to the hearing by cutting himself, but "[i]t was minor." (Tr. 45-46). Plaintiff also testified that he had thoughts of hurting others. (Tr. 53). He attended therapy sessions twice a month but had missed the last several sessions because he did not have transportation there and he does not like riding buses. (Tr. 46-47). Plaintiff testified that he does not get along with people and he has frequent physical or verbal altercations when he goes out in public. (Tr. 48, 56). The only person that he sees besides his parents is a girlfriend, and he has no friends. (Tr. 49). He testified that it was a problem just having coworkers around him because he feels like most of them are talking about him behind his back. (Tr. 53).

As to his daily activities, plaintiff testified that he took care of his personal grooming by himself, cooked, did dishes and his laundry, and vacuumed and swept his room, as well as other

23

parts of the house when noone else was home. (Tr. 51-52). He testified that he does not drive and he does not use public transportation because he cannot be around people. (Tr. 47, 52).

## THE VE'S TESTIMONY

The ALJ asked the VE if an individual with the following limitations could perform any unskilled work that exists regionally and nationally: The individual is able to perform only simple, routine, repetitive tasks; the individual can remember and carry out only short and simple instructions; the individual cannot interact with the general public; the individual can interact no more than occasionally with coworkers or supervisors; and the job should not require more than simple, work-related decisions, or more than ordinary and routine changes in work setting or duties. (Tr. 64-65). The VE responded that there would be unskilled positions such as parks and grounds worker, farm worker, laundry worker, and housekeeping positions where individuals would not be exposed to other workers and/or more than occasional supervision. (Tr. 65-66). When the limitations were added that the individual was unable to interact to any extent with coworkers or supervisors, or if the individual were to have verbal outbursts once or twice a month, the VE testified the individual would not be able to maintain employment. (Tr. 67).

## THE ALJ'S DECISION

Because plaintiff attained the age of 18 after he filed his disability application but before the Commissioner made a determination, the ALJ analyzed plaintiff's claim under both (1) the three-step sequential evaluation set forth in 20 C.F.R. § 416.924 for childhood SSI benefits, and (2) the five-step sequential evaluation process set forth in 20 C.F.R. § 416.920 for individuals over the age of 18.

24

**1. The ALJ's Disability Determination for Childhood SSI Benefits**

In conducting the three-step evaluation for childhood SSI benefits, the ALJ found that before attaining age 18, plaintiff: (1) had not engaged in substantial gainful activity since the alleged onset date (Tr. 13); (2) had a "severe combination of impairments" of paranoid schizophrenia, affective disorder, and ADHD (Tr. 13); and (3) did not have an impairment or combination of impairments that met or medically equaled the Listing of Impairments, and did not have an impairment that functionally equaled the Listings. (Tr. 13-15).

At the third step of the evaluation, the ALJ determined that plaintiff's impairments did not meet or medically equal the Listings because plaintiff did not have marked impairment in age appropriate cognitive/communicative function, social functioning, personal functioning, or the ability to maintain concentration, persistence or pace so as to satisfy the following mental disorders listings for children under age 18: Organic Mental Disorders (112.02), Schizophrenic and other Psychotic Disorders (112.03), Mood Disorders (112.04) or ADHD (112.11). (Tr. 13).

The ALJ also determined that plaintiff did not have an impairment or combination of impairments that functionally equaled the Listings. (Tr. 15). The ALJ found:

- Plaintiff has no limitation in his ability to acquire and use information. (Tr. 17).
- Plaintiff has less than marked limitation in attending and completing tasks. The ALJ stated that he gave "significant weight" to the state agency psychologists' opinion that plaintiff's difficulty in this functional domain is less than marked. (Tr. 18). The ALJ stated that this opinion was consistent with Dr. Lester's evaluation, wherein Dr. Lester estimated that plaintiff's concentration, persistence and pace was at about 2/3 of his age appropriate level. The ALJ noted that the accommodation of taking tests in a small class helped plaintiff perform better in school, by 2006-2007 he was performing much better in school because of his IEP, and in May 2007, he was described as an "excellent student." The ALJ also noted that plaintiff plays video games, which requires significant attention, and he watches television. (Tr. 18).
- Plaintiff has less than marked limitation in interacting and relating with others. The ALJ noted the testimony from plaintiff regarding his issues in this area and his reports in the

25

treatment notes; his mother's testimony; statements plaintiff's mother had made which were consistent with her testimony to Dr. Lester and the application materials; plaintiff's testimony as to his problems being around people; school records indicating plaintiff has long-term problems expressing his anger appropriately, that he has been suspended from school for behavior problems, and that he curses at authority figures and threatens violence; Dr. Lester's estimation that plaintiff performed socially at 2/3 his age appropriate level; and the "state agency" opinion that plaintiff has marked limitation in this functional domain. (Tr. 19). However, the ALJ rejected this limitation on the grounds that plaintiff interacted with his therapists, (Tr. 185), his symptoms improved when he was on medication (Tr. 195, 197, 199, 204, 208), by May 2007 he was quiet and kept to himself and had no behavior issues, and in March 2008 he was making adequate progress toward controlling his emotions when frustrated by others. (Tr. 18-19).

- Plaintiff has no limitation in moving about and manipulating objects. (Tr. 20).
- Plaintiff has less than marked ability to care for himself. He is supposed to help around the house, but he has trouble working around his brothers. (Tr. 21).
- Plaintiff has less than marked limitation in health and physical well-being.

The ALJ concluded that because plaintiff did not have impairments that resulted in either "marked limitations" in two domains of functioning or "extreme" limitation in one domain of functioning, plaintiff was not disabled before he reached the age of 18. (Tr. 22).

## 2. Adult SSI Disability and Childhood Disability Benefits After Plaintiff Attained Age 18

In conducting the five-step sequential evaluation for whether plaintiff has been disabled since attaining age 18, the ALJ found that plaintiff continues to have the same impairments as before turning 18. The ALJ also determined that plaintiff does not have an impairment or combination of impairments which meets or medically equals the Listings for adults. Specifically, the ALJ determined that after plaintiff attained age 18, his mental impairments did not meet or medically equal the criteria of Listing 12.03 or 12.04. (Tr. 14).[3] The ALJ examined whether the "Paragraph B" criteria for Listing 12.03, "Schizophrenic, paranoid and other

---

[3]For purposes of Child's Insurance Benefits on the basis of a disability, a claimant over 18 years of age must show he is or became disabled before attaining the age of 22. *See* 20 C.F.R. § 404.350(a)(5).

psychotic disorders," and 12.04, "Affective disorders," were satisfied.[4] The ALJ considered plaintiff's testimony regarding his daily activities and plaintiff's mother's testimony, and the ALJ stated that he also considered plaintiff's alleged demonstrated ability to succeed in school and at work with mental health treatment and accommodations. (Tr. 14-15). The ALJ found that plaintiff has the following degree of limitation:

- Mild restriction in activities of daily living
- Moderate restriction in social functioning
- Moderate restriction in concentration, persistence or pace
- No episodes of decompensation.

(Tr. 14-15). The ALJ determined that because plaintiff's mental impairments do not cause at least two "marked" limitations or one "marked" limitation and "repeated episodes of decompensation," the "Paragraph B" criteria are not satisfied. (Tr. 15).

The ALJ also determined that the "Paragraph C" criteria are not satisfied because plaintiff has not experienced repeated episodes of decompensation, such marginal adjustment that even a minimal increase in mental demands would be predicted to cause him to decompensate, or a one or more year history of inability to function outside a highly supportive living arrangement.[5] (Tr. 15).

---

[4] The "Paragraph B" criteria are: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation, each of extended duration. At least two of the criteria must be present for Paragraph B to be satisfied.

[5] The ALJ cited Listing 12.04, "Affective Disorders," after setting forth the Paragraph C criteria. However, the same Paragraph C criteria cited by the ALJ are also found in Listing 12.03. They are: "1. Repeated episodes of decompensation, each of extended duration; or 2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or 3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement."

The ALJ then determined that plaintiff has the following RFC:

> [He can] perform a full range of work at all exertional levels but with the following nonexertional limitations: [He] can perform only simple, routine, repetitive tasks. He can remember and carry out only short, simple instructions. He cannot interact with the general public and cannot interact more than occasionally with coworkers and supervisors. [H]is job should not require more than ordinary and routine changes in work settings or duties. [H]e is able to make only simple work related decisions.

(Tr. 22). The ALJ stated that in rendering the RFC assessment, he had considered plaintiff's

symptoms, the extent to which those symptoms could be accepted as consistent with the

objective medical evidence and other evidence, and the opinion evidence. (Tr. 23). The ALJ

stated that plaintiff's medically determinable impairments could reasonably be expected to

produce some of his alleged symptoms, but plaintiff's statements concerning the intensity,

persistence, and limiting effects of those symptoms are not credible to the extent they are

inconsistent with plaintiff's RFC. (Tr. 23).

In terms of the opinion evidence, the ALJ then stated that he gave "some weight" to Dr.

Jette's opinion as reflected in the Mental Impairment Questionnaire (Tr. 389-391) "to the extent

that it is consistent with the overall evidence outlined in this decision" and significant weight to

the opinions of the consultative examiner and state agency reviewers:

> Giving significant weight to Dr. Lester's opinion (as the claimant does not appear to have worsened since this evaluation was performed), some weight to Dr. Jette's opinion, significant weight to the state agency, and some weight to the claimant's and his mother's testimony, the undersigned finds the claimant requires a residual functional capacity that accommodates moderate impairment in social functioning and concentration, persistence, or pace. Because of his ADHD, the claimant can perform only simple, routine, repetitive tasks and can remember and carry out only short, simple instructions. Because he has difficulty working around other people, he cannot interact with the general public and cannot interact more than occasionally with coworkers and supervisors. Because of a diminished stress and frustration tolerance, the claimant's job should not require more than ordinary and

28

> routine changes in work settings or duties. Because of impaired judgment and a low stress tolerance, the claimant is able to make only simple work related decisions.

(Tr. 24).

The ALJ concluded the five-step analysis by finding that plaintiff has no past relevant work. (Tr. 24). However, using the medical vocational guidelines set forth in Grid Rule 204.00 as a framework for decision-making, and relying on the VE's testimony, the ALJ determined that plaintiff is capable of making a successful adjustment to other work that exists in significant numbers in the national economy. (Tr. 25).

## OPINION

Plaintiff assigns four errors in this case: (1) the ALJ erred by focusing only on that evidence which favored a denial of benefits, rather than looking at the record as a whole, and by failing to find plaintiff disabled prior to attaining the age of 18; (2) the ALJ failed to give proper weight to Dr. Jette's opinion, including his opinion that plaintiff's impairments meet Listing 12.03C; (3) the ALJ erred by failing to provide specific reasons for his findings; and (4) the ALJ erred in finding that plaintiff was not credible.

### 1. Plaintiff's first, second, and third assignments of error should be sustained.

The ALJ determined that plaintiff did not have an impairment or combination of impairments that met or equaled the Listings both before and after attaining age 18, or that was functionally equivalent to a listed impairment before plaintiff attained age 18. Plaintiff argues that in making these findings, the ALJ selectively cited to those portions of the record supporting a finding of no disability to the exclusion of contrary evidence. Plaintiff asserts the ALJ also failed to give controlling weight to the opinion of plaintiff's treating psychiatrist, Dr. Jette.

29

Plaintiff argues the ALJ failed to address the portion of Dr. Jette's opinion which supports a finding that plaintiff meets Listing 12.03C for paranoid schizophrenia and to address the pertinent factors for evaluating a treating physician's opinion. Plaintiff contends that instead, the ALJ addressed Dr. Jette's opinion only at the conclusion of the RFC assessment, where the ALJ stated that he gave "some weight" to Dr. Jette's opinion "to the extent that it is consistent with the overall evidence outlined in this decision." (Tr. 24). Plaintiff further asserts the ALJ misconstrued the record evidence in finding plaintiff did not meet, equal or functionally equal a Listing and failed to consider the record as a whole.

The Commissioner contends that Dr. Jette's notes are handwritten and difficult to read, and it is unclear how, if at all, they support the degree of limitation that Dr. Jette endorsed in October 2008. (Tr. 337-360; 389-391). The Commissioner further argues that Dr. Jette's October 2008 opinion is inconsistent with certain findings and with the school records showing improvement in plaintiff's behavior and academic performance in 2007 and 2008, so that any error by the ALJ in not discussing Dr. Jette's opinion in terms of the Listings was harmless.

The Court finds the ALJ's determination that plaintiff's impairments did not meet, equal, or functionally equal a Listing is not supported by substantial evidence. First, the ALJ failed to consider the opinion of plaintiff's treating psychiatrist in the ALJ's Listings analysis. While the ALJ indicated he gave "some weight" to Dr. Jette's opinion in establishing plaintiff's RFC, the ALJ wholly and improperly ignored without explanation Dr. Jette's opinion in the Listings analysis.

Dr. Jette diagnosed plaintiff with paranoid schizophrenia in July 2007, although he suspected the diagnosis as early as March 2007 when he assessed "bipolar depressed with

30

psychotic features, R/O paranoid schizophrenia." (Tr. 355, 360). Following some 18 months of

treatment, Dr. Jette reported in October 2008:

> Marcus remains consistently paranoid. His mood is labile. He is sad with a bad
> temper. He sometimes threatens to [illegible] people. He has suicide thoughts.
> He has some command hallucinations.

(Tr. 389). The treating psychiatrist opined that plaintiff suffers from paranoid schizophrenia and

ADHD, and that despite his medication regimen, depression and negative symptoms persist. (Tr.

389). Dr. Jette opined that plaintiff suffers from the following impairment, which had lasted or

could be expected to last at least 12 months:

> Medically documented history of a chronic organic mental, schizophrenic, etc., or
> affective disorder of at least 2 years' duration that has caused more than a minimal
> limitation of ability to do any basic work activity, with symptoms or signs
> currently attenuated by medication or psychosocial support, and . . .

> [a] residual disease process that has resulted in such marginal adjustment that
> even a minimal increase in mental demands or change in the environment would
> be predicted to cause the individual to decompensate.

(Tr. 390). Dr. Jette's October 2008 report indicates that plaintiff meets Listing 12.03C.[6]

Dr. Jette also reported that plaintiff's development and performance of age appropriate

activities in the domains of social development and personal/behavioral development were

markedly impaired. (Tr. 391). Dr. Jette's reported findings strongly indicate that before plaintiff

---

[6]An impairment meets Listing 12.03C.2 when an individual has a medically documented history of a
chronic schizophrenic, paranoid, or other psychotic disorder of at least 2 years' duration that has caused more than a
minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication
or psychosocial support, and one of the following:

  1. Repeated episodes of decompensation, each of extended duration; or

  2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in
mental demands or change in the environment would be predicted to cause the individual to decompensate; or

  3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement,
with an indication of continued need for such an arrangement. 20 CFR Pt. 404, Subpt. P, App. 1.

attained age 18 he met or equaled Listing 112.03 for schizophrenic, delusional (paranoid),

schizoaffective, and other psychotic disorders for children's SSI benefits.[7]

Despite the treating psychiatrist's evidence showing plaintiff met or equaled a Listing, the

ALJ failed to mention Dr. Jette's findings in his Listings decision or discuss the weight accorded

to the treating psychiatrist's opinion in these regards.  Because the ALJ failed to mention Dr.

Jette's opinion that plaintiff met or equaled Listing 12.03C.2 (after plaintiff attained age 18) and

Listing 112.03 (before plaintiff attained age 18), it is impossible for this Court to conduct any

meaningful judicial review to determine whether the ALJ's Listings analysis is supported by

substantial evidence.

Moreover, the ALJ committed an error of law when he failed to indicate that he

considered the regulatory factors set forth in 20 C.F.R. § 404.1527(d)(2) in determining the

weight to afford Dr. Jette's opinion.  When an ALJ declines to give controlling weight to a

treating physician's assessment, "the ALJ must still determine how much weight is appropriate

by considering a number of factors, including the length of treatment relationship and the

---

[7]Listing 112.03 requires:

Onset of psychotic features, characterized by a marked disturbance of thinking, feeling, and behavior, with deterioration from a previous level of functioning or failure to achieve the expected level of social functioning.  The required level of severity for these disorders is met when the requirements in both A and B are satisfied.

A. Medically documented persistence, for at least 6 months, either continuous or intermittent, of one or more of the following:
    1. Delusions or hallucinations; or
    2. Catatonic, bizarre, or other grossly disorganized behavior; or
    3. Incoherence, loosening of associations, illogical thinking, or poverty of content of speech; or
    4. Flat, blunt, or inappropriate affect; or
    5. Emotional withdrawal, apathy, or isolation;
and
B. For . . . children (age 3 to attainment of age 18), resulting in at least two of the appropriate age-group criteria in paragraph B2 of 112.02.

frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician." *Blakley*, 581 F.3d at 406; *Wilson*, 378 F.2d at 544. In accordance with this rule, the ALJ must give "good reasons" for the ultimate weight afforded the treating physician opinion, based on the evidence in the record, *and the reasons must be sufficiently specific to enable meaningful review of the ALJ's decision. Id.* (citing 20 C.F.R. § 404.1527(d)(2); Social Security Ruling 96-2p; *Wilson*, 378 F.3d at 544) (emphasis added)). The ALJ's failure to adequately explain the reasons for the weight given a treating physician's opinion "*denotes a lack of substantial evidence*, even where the conclusion of the ALJ may be justified based upon the record." *Blakley*, 581 F.3d at 407 (emphasis in the original and quoting *Rogers v. Comm'r*, 486 F.3d 234, 243 (6th Cir. 2007)).

An examination of the record evidence indicates that Dr. Jette's opinion was entitled to considerable weight. Dr. Jette is a specialist in psychiatry who treated plaintiff on a regular basis from March 2007 through October 2008. The record contains 16 months' worth of progress notes documenting Dr. Jette's psychiatric therapy sessions with plaintiff. Dr. Jette's opinion is well-supported by his own treatment notes and objective findings, as well as those of plaintiff's other therapists. (Tr. 194-247).

In addition, Dr. Jette's opinion is largely consistent with the opinions of the other medical sources. The sole finding of Dr. Jette that the ALJ expressly rejected - that plaintiff had marked limitation in social development and personal behavior development - is in fact substantially supported by the opinions of the state agency reviewing psychologists and psychiatrists. These medical sources agreed that plaintiff had "marked" limitation in interacting and relating with

33

others, stating that he "has problems getting along with others," he "avoids situations where he

will [be] around a 'mass' of people," he "feels that people are talking about him," he "has violent

rhetoric," although he does not act on it, he fights with his siblings, he "does not get along with

his teachers," and he has "delusional thinking." (Tr. 190, 250).

Dr. Jette's opinion is also consistent with the findings of the consultative examining

psychologist, Dr. Lester, who found as follows:

> In regard to personal/behavioral patterns, Marcus is spending most of his time
> staying in his room and watching television and playing video games. He does
> not do chores in a timely manner. He has had many problems at school with
> temper control and appropriate expression of anger. He would be estimated at
> performing at two-thirds of his age appropriate level.
>
> Socially, Marcus angers easily and appears to be quite dependent upon his mother.
> He avoids situations where he will be around a 'mass' of people. He feels that
> people are talking about him. He is experiencing delusional thinking and possible
> auditory hallucinations. He would be estimated as performing at two-thirds of his
> age appropriate level.[8]

(Tr. 187).

Plaintiff's difficulties interacting and relating with others and personal/behavioral

development are also well-documented in the record by plaintiff's teachers and social workers.

(See Tr. 241 - diagnostic impression of social problems with peers; Tr. 212 - having difficulties

with reactions to teachers at times; Tr. 211 - plaintiff was easily agitated and could act out in an

aggressive manner if provoked; Tr. 204-05 - plaintiff sometimes feels like people are plotting

against him, he does not like it if people look at him a lot, he gets agitated if people are too close

to him, he could be labile or reactive, and according to reports he could be defensive or angry; Tr.

---

[8]Plaintiff was age 16 at the time of his examination by Dr. Lester. Thus, in terms of personal/behavioral
and social functioning, he was functioning at the level of a 10 year old.

202 - plaintiff was having problems with significant angry thoughts that arise when he feels others are trying to intimidate him and has thoughts of doing something harmful which he questioned if he could resist; Tr. 199 - plaintiff still had some suspiciousness and a component of paranoia, with a reluctance to be around groups of people and trust others, even as far as getting on the bus to school; Tr. 198 - plaintiff was more anxious with the paranoia; Tr. 186- plaintiff reported to Dr. Lester that he felt people talk about him and say bad things about him; he feels upset and anxious around "mass people," his heart starts beating more, and he handles this by getting mad and "cussing"; Tr. 343-346, 347, 349, 354, 356-357, 359 - plaintiff had episodes of "going off" with shouting and cursing, punching walls, and hurting or wanting to hurt people, and he experienced auditory hallucinations and/or discomfort around others).

Although the ALJ was not bound by Dr. Jette's opinion, he was obligated to articulate "good reasons" based on the evidence of record for not giving weight to the opinions of plaintiff's treating psychiatrist. *See Wilson*, 378 F.3d at 544. The ALJ failed to do so. The ALJ's rejection of Dr. Jette's opinion is thus inconsistent with the legal standards applicable for determining the weight to accord a treating physician's opinion and lacks substantial support in the record. *Blakley*, 581 F.3d at 407.

In addition, when deciding that plaintiff's impairments did not meet or medically equal the Listings both before and after plaintiff attained age 18, the ALJ selectively cited those portions of the record which support a finding that plaintiff did not meet, medically equal or functionally equal a listed impairment to the exclusion of others leading to a contrary conclusion.

As indicated above, the ALJ failed to even mention Dr. Jette's opinion that plaintiff's paranoid schizophrenia was of Listing level severity.

35

Likewise, in assessing plaintiff's social functioning in determining plaintiff did not meet or equal a Listing, the ALJ relied almost exclusively on the testimony of plaintiff and his mother to the exclusion of the other record evidence. (Tr. 14). The ALJ thus failed to comply with the applicable regulations, which require that if a mental impairment is severe, the ALJ will compare "the medical findings about [the] impairment(s) and the rating of the degree of functional limitation to the criteria of the appropriate listed mental disorder." 20 CFR § 404.1520a(d)(2).

Here, the medical findings from the state agency psychologists and physicians in August 2006 and January 2007 support that plaintiff had a marked limitation in his ability to interact and relate with others. (Tr. 190-91; 250-51). The ALJ did not discuss these findings in his Listings analysis. (Tr. 14-15). Also, Dr. Lester opined in July 2006 that plaintiff was performing at two-thirds of his age appropriate level (*i.e.,* functioning as a 10-year-old at a chronological age of 16) both "Socially" and with respect to "Personal/behavior patterns." (Tr. 187). Again, the ALJ failed to discuss these findings in his Listings decision. (Tr. 14-15).

The only real analysis the ALJ devoted to the Listing's issue was whether plaintiff was markedly impaired in any of the six domains of functioning for purposes of determining whether plaintiff, before attaining age 18, had an impairment or combination of impairments that *functionally* equaled the Listings. (Tr. 15-22). The ALJ discounted Dr. Lester's medical opinions and the evidence that plaintiff had a marked limitation in interacting and relating with others on the ground that he was able to interact with his therapists, (Tr. 185), his symptoms improved when he was on medication (Tr. 195, 197, 199-204, 208), by May 2007 he was quiet and kept to himself and had no behavior issues, and in March 2008 he was making adequate progress toward controlling his emotions when frustrated by others. (Tr. 18-19). However, the ALJ ignored the

36

full extent of the treatment notes in May 2007, which were that although plaintiff's mother

reported to the therapist following an appointment with plaintiff's psychiatrist, Dr. Jette, that

plaintiff was doing "exceptionally well in his school program," plaintiff's mother also reported

that plaintiff's "paranoia was bad," the doctor had changed his medicine, and plaintiff agreed that

the paranoia remained unchanged; plaintiff reported that he did not like school because of the

other people but that he "only had one year left;" and plaintiff's mother reported that his job at

King's Island had lasted only two days because of plaintiff's paranoia. (Tr. 383). Moreover,

plaintiff's ability to interact in a one-on-one counseling session with a trained therapist and his

improved function in a structured setting at school pursuant to his IEP are not substantial

evidence which contradicts the opinion of Dr. Jette and the other medical sources that plaintiff

had a marked limitation in interacting and relating with others and in personal/behavioral

development. The ALJ's finding to the contrary is not supported by substantial evidence, and

highlights the ALJ's failure to fairly review the record evidence in context and as a whole.

For these reasons, the Court determines the ALJ's Listings findings are not supported by

substantial evidence and should be reversed.

**2. Plaintiff's fourth assignment of error should be sustained**

Plaintiff claims that the ALJ's credibility finding is not supported by the record. Plaintiff

claims that the ALJ erred by finding he was not credible based on evidence that has no bearing

on the issue of his credibility.

The Commissioner cites a number of pages in the record which purportedly support the

ALJ's determination that the "medical evidence and school records undercut Plaintiff's claimed

degree of limitation." (Doc. 14 at 17). The Commissioner asserts that the school records are

particularly significant because they show that after turning 18, plaintiff completed all of the required course work for graduation from high school and was making adequate progress towards most of his IEP objectives.

The ALJ determined that plaintiff's medically determinable impairments could reasonably be expected to produce his alleged symptoms. However, the ALJ found that his statements concerning the intensity, persistence, and limiting effects of his symptoms were not credible to the extent they were inconsistent with plaintiff's RFC for the following reasons:

- Although plaintiff had been diagnosed with ADHD before the alleged onset date, it responded well to medication (Tr. 170); as of his alleged onset date, he was seeing a psychiatrist and therapist; he was taking Trusopt, Zoloft, Focalin and Risperdal; and he has no history of inpatient or residential treatment.

- Dr. Lester diagnosed plaintiff with mood disorder, anxiety disorder and ADHD and assigned him a GAF of 50, but the record does not confirm Dr. Lester's anxiety diagnosis.

(Tr. 16). The ALJ acknowledged that some treatment notes continued to indicate "homicidal ideation, irritability, anger and paranoia . . . ." (Tr. 23). However, the ALJ stated that in May 2007 plaintiff was described as an excellent student who always works hard; in October 2007, plaintiff reported that school was going well and that he had gone to a college fair; by January 2008, plaintiff had completed the course work toward graduation; in April 2008 plaintiff reported that he was working and had been moved from the dining room to the dish room at his job, where he was much more comfortable, and he was purportedly no longer stressed; and in June 2008, plaintiff was making adequate progress toward some of his IEP goals. (Tr. 23). The ALJ also found that plaintiff had lost jobs primarily due to attendance. (Tr. 23).

"If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reasons for doing so." *Felisky,* 35 F.3d at 1036. The ALJ's decision "must contain specific reasons for

38

the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." Social Security Rule 96-7p. The ALJ's articulation of reasons for crediting or rejecting a claimant's testimony must be explicit and "is absolutely essential for meaningful appellate review." *Hurst v. Sec. of H.H.S.*, 753 F.2d 517, 519 (6th Cir. 1985) (citing *Zblewski v. Schweiker*, 732 F.2d 75, 78 (7th Cir. 1984)).

Here, the ALJ failed to clearly state his reasons for rejecting plaintiff's testimony to the extent he deemed it to be unworthy of credence. The ALJ culled certain information from the record to support his credibility finding, but he does not explain how that information casts doubt on plaintiff's credibility. Thus, it is not at all clear how the medical findings cited by the ALJ at page 16 of the hearing decision cast doubt on plaintiff's claim that he cannot work because he has difficulty with customers and coworkers. (Tr. 41). Nor is it clear how plaintiff's improvement under his school IEP calls into question plaintiff's testimony about his inability to work, particularly since the ALJ failed to examine whether plaintiff was making similar progress outside of the highly-structured school setting. The ALJ was required to examine the effects of structured or supportive settings such as those provided by plaintiff's IEP in determining his level of functioning. *See* 20 C.F.R. § 416.926a(a)(1); Social Security Ruling 09–1p, Section III (recognizing that child who "needs a person, medication, treatment, device, or structured, supportive setting to make his functioning possible or to improve the functioning" is not "as independent as same-age peers who do not have impairments"). *See also* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00C(3) (requiring caution in reaching conclusions about claimant's ability

39

to complete tasks based on functioning in settings that are less demanding, highly structured, or more supportive). Had the ALJ looked beyond how plaintiff was performing in school with accommodations at this point in time, the ALJ would have noted that in July 2008, the same month plaintiff graduated from high school, plaintiff's therapist reported that in the area of plaintiff's mental status, there had been "[l]ittle progress. He is stagnated and has a difficult time taking charge of his mood/life and doing what he can to begin to move forward." (Tr. 371). In the absence of any indication in the ALJ's decision that he considered the effect of plaintiff's functioning outside of his structured school setting and a clear articulation of the reasons for rejecting plaintiff's testimony as incredible, meaningful review of the ALJ's credibility determination is impossible. Plaintiff's fourth assignment of error should be sustained.

## CONCLUSION

If the Commissioner's decision is not supported by substantial evidence, the Court must decide whether to reverse and remand the matter for rehearing or to reverse and order benefits granted. The Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." 42 U.S.C. § 405(g); *Melkonyan v. Sullivan*, 501 U.S. 89, 98 (1991).

Where the Commissioner has erroneously determined that an individual is not disabled at steps one through four of the sequential evaluation, remand is often appropriate so that the sequential evaluation may be continued. *DeGrande v. Secretary of H.H.S.*, 892 F.2d 1043, 1990 WL 94 (6th Cir. Jan. 2, 1990). Remand is also appropriate if the Commissioner applied an erroneous principle of law, failed to consider certain evidence, failed to consider the combined

effect of impairments, or failed to make a credibility finding. *Faucher v. Secretary of H.H.S.*, 17
F.3d 171, 176 (6th Cir. 1994).

      Benefits may be immediately awarded "only if all essential factual issues have been
resolved and the record adequately establishes a plaintiff's entitlement to benefits." *Id.*
The Court may award benefits where the proof of disability is strong and opposing evidence is
lacking in substance, so that remand would merely involve the presentation of cumulative
evidence, or where the proof of disability is overwhelming. *Faucher*, 17 F.3d at 176. *See also*
*Felisky*, 35 F.3d at 1041; *Mowery v. Heckler,* 771 F.2d 966, 973 (6th Cir. 1985).

      The Court notes that all essential factual issues have not been resolved in this matter, nor
does the current record adequately establish plaintiff's entitlement to benefits as of his alleged
onset date. *See Faucher,* 17 F.3d at 176. This matter should be remanded for further
proceedings pursuant to sentence four of § 405(g) due to the ALJ's failure to properly weigh the
opinion of Dr. Jette, the treating psychiatrist, as required by the Social Security Regulations and
Sixth Circuit law and due to errors in the ALJ's credibility determination. On remand, the
Commissioner and the ALJ should be directed to (1) reevaluate the medical source opinions and
plaintiff's credibility under the legal criteria set forth in the Regulations, Rulings, and as required
by case law; and (2) determine anew whether plaintiff is under a disability within the meaning of
the Social Security Act.

## IT IS THEREFORE RECOMMENDED THAT:

This case be **REVERSED** and **REMANDED** for further proceedings pursuant to

Sentence Four of 42 U.S.C. § 405(g).

Date: 3/4/2011

Karen L. Litkovitz
United States Magistrate Judge

42